**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GIL A. MILLER, as Receiver for IMPACT PAYMENT SYSTEMS, LLC, and IMPACT CASH, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>LAUNEY IVERS, an individual,<br><br>Defendant. | **MEMORANDUM DECISION and ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:12-cv-54-DN<br><br>District Judge David Nuffer |

Defendant Launey Ivers (Ivers) is an investor in Impact Payment Systems, LLC and Impact Cash, LLC (together, Impact). Plaintiff is the court-appointed receiver in *SEC v. Clark.*.[1] For the benefit of the estate, the Receiver seeks the return of the amount Ivers received from Impact in excess of his investment as a fraudulent transfer. The Receiver filed a motion for summary judgment[2] and Ivers did not respond. This order grants the motion for summary judgment, declaring that Ivers must return to the estate the amount he received from Impact in excess of his initial investment, plus post-judgment interest.

---

[1] Case No. 1:11-cv-46-DN (Impact Payment Systems, LLC and Impact Cash, LLC are named defendants).

[2] Receiver's Motion for Summary Judgment and Memorandum in Support (Motion), filed August 16, 2013, docket no. 13.

## UNDISPUTED FACTS

The following factual statements from the Receiver's motion for summary judgment are not disputed.

1. Ivers invested $60,000 in Impact.[3]

2. He received money from Impact in excess of his investment.[4] According to Impact's records, Ivers received $100,146 from Impact.[5] He therefore received $40,146 more than he invested.[6] Ivers denied receiving $100,146 from Impact, but has provided no evidence to suggest otherwise.[7]

3. This Court has already determined that Impact was operated as a Ponzi scheme.[8]

4. Gil A. Miller was appointed as Receiver in this matter on March 25, 2011.[9] Mr. Miller has concluded that Impact was operated with the characteristics of a Ponzi scheme since at least 2006.[10] Mr. Miller and the accountants working with him conducted a thorough analysis of Impact's business operations and its accounting records. They relied on the

---

[3] *See* Expert Report of David Bateman at 12, dated June 14, 2013 (Bateman Report), attached as Exhibit A to Motion, docket no. 13-1; Defendant's Answers to Request for Admissions, Response to Request No. 3, attached as Exhibit B to Motion, docket no. 13-2.

[4] *See* Defendant's Answers to Request for Admissions, Response to Request No. 2.

[5] Bateman Report at 12.

[6] *Id.*

[7] *See* Defendant's Answers to Request for Admissions, Response to Request No. 4.

[8] *See* Order on Receiver's Motion to Approve Plan of Distribution at 4, ¶4, docket no. 184, filed May 11, 2012 and Order at 2, docket no. 360, filed April 10, 2013 (each filed in *SEC v. John Scott Clark et al.,* Case No. 1:11-cv-46-DN).

[9] *See* Expert Report of Gil A. Miller at 3, dated July 16, 2013 (Miller Report), attached as Exhibit C to Motion, docket no. 13-3.

[10] *Id.* at 6-12.

contemporaneously kept records at Impact and on bank records obtained by subpoena.[11]  A detailed description of the methods employed is contained in the expert reports of Mr. Bateman and of Gil A. Miller.

5. Impact commingled investor funds through intercompany and inter-account transfers.[12]

6. Impact's financial records were not audited by a reputable accounting firm.[13]

7. Although Impact purported to maintain balance records for each investor, those records were inaccurate.  According to an e-mail from one of the accounting employees at Impact to Scott Clark, many of the investor accounts should have had negative cash balances.  At the time of his e-mail, August 9, 2010, there was a total negative balance of more than $8.3 million.[14]

8. In order to make distributions to investors who had a negative balance, Impact's accountants would book entries in the accounting records labeled as "temp loans," effectively taking money that had been accounted for as belonging to one investor and paying it to another.  In reality, no transfer of funds was necessary as all of the money was in a single account.[15]

9. Tori Jackson, who filled an accounting position with Impact, testified that distributions were sent to investors when companies had negative balances.[16]

---

[11] *See* Bateman Report at 5; Miller Report at 13.

[12] *See* Bateman Report at 5-8.

[13] *See* Miller Report at 10-11.

[14] *See* Bateman Report at 8 & n.11.

[15] *See id.* at 8.

[16] Jackson Beutler Dep. 123:10, May 9, 2011 (relevant portions attached as Exhibit D to Motion, docket no. 13-4).

10. Impact Payment Systems had losses totaling $1,056,055 as of December 31, 2009.[17]

11. Impact and its related companies did not show an operating profit in any year when distributions to investors were made. The Impact entities realized a collective net loss of nearly $3 million during that time.[18] Nevertheless, they distributed over $52.6 million.[19]

12. When Impact's records include an appropriate bad debt adjustment, none of the $52.6 million in payments could have been made with operating profits. The only source for these distributions was from principal invested by other investors.[20]

13. Dirk Pace, an Impact accounting employee, testified that since he was hired by the company in September 2008, it recorded a loss each year and used investor money to cover those losses.[21]

14. One of Impact's accountants, Brandon Cowley, testified in his deposition that new investor money that was supposed to be used to fund payday loans came into Impact accounts and left the accounts within the same week to pay out old investors who had requested dividend payments or liquidation proceeds.[22]

15. Impact investors were promised large returns for their investments. Some investors were promised up to an 80% annual return. Others were told they would double their

---

[17] *See* Bateman Report at 8.

[18] *See id.* at 11.

[19] *Id.*

[20] *Id.*

[21] Pace Dep. 17:12-21, October 7, 2011 (relevant portions attached as Exhibit E to Motion, docket no. 13-5).

[22] Cowley Dep. 28-29, May 24, 2011 (relevant portions attached as Exhibit F to Motion, docket no. 13-6).

money in a year, or even within months.  Investors were typically led to believe they were making between 30 and 40 percent in annual returns.[23]

16. Impact used investor funds that were supposed to be used for payday loans to cover expenses.[24]

17. Impact used investor funds to support Mr. Clark's standard of living.[25]

18. One person, Scott Clark, was principally responsible for Impact's operations.[26]

## Fraudulent Transfer Law and the Ponzi Presumption

The Utah Uniform Fraudulent Transfer Act provides:

(1) A transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . .

    (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

    (b) without receiving a reasonably equivalent value in exchange for the transfer.[27]

The Receiver's burden of proving actual intent on summary judgment is conclusively established by proving the entities under his control were operated as a Ponzi scheme.[28]  This Court has previously determined that Impact was operated as a Ponzi scheme, and reiterates that determination here.

---

[23] *See* Miller Report at 8.

[24] *Id.* at 10.

[25] *Id.*

[26] *Id.* at 11.

[27] Utah Code Ann. § 25-6-5(1)(a), (b).

[28] *See Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995)).

Under the Uniform Fraudulent Transfer Act (UFTA), once it is established that a debtor acted as a Ponzi scheme, all transfers by that entity are presumed fraudulent.[29] "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."[30] Once a receiver proves a company operated as a Ponzi scheme, he has conclusively established that it transferred investment returns with the intent to defraud the investors, making the transfers to the investors "fraudulent transfers" within the meaning of the UFTA.[31]

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] Based on this standard, and for the reasons mentioned above, this Court grants the Receiver's motion for summary judgment.

**ORDER**

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment[33] is GRANTED.

/

/

/

---

[29] *See Wing v. Dockstader*, 482 Fed.Appx. 361, 363 (10th Cir. 2012) (citing *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[30] *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).

[31] *Wing v. Gillis*, No. 2:09-cv-314, 2012 WL 994394, at *2 (D.Utah Mar. 22, 2012), *aff'd*, No. 12-4071, 2013 WL 2169321 (10th Cir. May 21, 2013).

[32] Fed. R. Civ. P. 56(a).

[33] Docket no. 13.

IT IS FURTHER ORDERED that Launey Ivers must return $40,146 to the receivership estate, plus interest at the statutory post-judgment rate pursuant to 28 U.S.C. §§ 1961(a) and 1961(b).

Signed April 17, 2014.

BY THE COURT

_____
District Judge David Nuffer